Thank you, Your Honor, it may have pleased the Court. The issues in this case, both infringement and validity, can be divided between two different claim terms, the first being homogeneous matrix, the second being agent that enhances the solubility of oxcarbazepine, and I'd like to address them in that order with respect to the claim terms. Let me tell you, I've looked at the patent and the prosecution history here, it seems to me that when this term, homogeneous, was introduced into the patent, that the applicant gave an explanation which said homogeneous means processed according to the examples of the patent, basically, and I think that's at 14809. So, why isn't that the definition of homogeneous, that is, processed according to the examples of the patent? I guess the two examples that describe the mixing process are examples one and four, and in fact, in the written description argument, the patent key relies on those, particularly example four, as providing the written description support for homogeneous. So why isn't that the proper construction of homogeneous? I thank you, Your Honor. The statement was that support for the amendment can be found in the specification, and they pointed to two parts. They pointed, one, to the textual phrase homogeneous matrix. Yeah, there's not much there. Correct. And then they said, and in the working examples. So I think there's a big difference, Your Honor, between saying I can find support for an amendment in something and saying that the characteristics of an example then define the meaning for terms of claim construction. So I think if I was making that argument saying homogeneous matrix is limited to the result of example four, that's the only one that actually has all four ingredients, it is limited to that. Well, I'm not sure it's the ingredients, I think it's because the patent contemplates different ingredients. Right. It's more of a mixing process, which is described both in one and four. Although the claim requires specific elements, in example one doesn't have all of them. But let's put that aside, if we could, Your Honor. If I was arguing that homogeneous matrix was limited to the product made by that process, then I would be accused, and I think probably rightly, of trying to limit the claim to the working example, or trying to import limitations from the specification into the claim. And there's a big difference, Your Honor, I respectfully submit, between saying, having an express definition, you know, in the terms of either lexicography, or as used here in this case, this term means that, on the one hand, which will clearly control claim construction. And on the other hand, having the standard statement that says, support for the amendment can be found at this paragraph. And I would continue. That's really the problem, is there really isn't anything in the specification, other than the one appearance of the word homogeneous, that tells you what it means. And the only part of the prosecution history that tells us what it means is that reference which I cited to you, which refers to the example. But again, I don't think that controls for purposes of claim construction. And I think, Your Honor, that the limitation, not in terms of a claim limitation, but the limitation that's in the specification, with respect to homogeneous matrix, contributes both to the problems that we pointed out, with lack of written description, and indefiniteness. But if I could take the infringement first, the district court's claim construction on its face. Well, she seems to rely on the process as showing infringement to a large extent. Yes, the district court. Yeah, the district court. And regarding the other things, that is the FDA standard, the chemical analysis, as merely quote, confirming what she found as a result of the process, right? Yes, and we address why that's wrong. But if we look at the district court's verbal claim construction at the Markman face, right? We thought we won this. This was basically what we argued for. And the district court at the Markman face said, a matrix in which the ingredients or the arguments are dispersed. And Her Honor specifically rejected the arguments by Supernus to say, substantially uniform, or to say, in a given volume. So you're now saying the claim construction you've got is indefinite, that you proposed to us. No, I don't think it is. And the claim construction on its face is not indefinite, but it is pretty narrow. So uniform doesn't mean mostly uniform, substantially uniform, largely uniform. It doesn't mean that only the active pharmaceutical ingredient needs to be uniform. It doesn't mean that only part of the formulation needs to be uniform. It is a narrow term that was construed. It was the patentee's choice to use homogeneous matrix during the prosecution. And it is now stuck with that. Now, it could have challenged the claim construction on its field. But you're claiming construction mostly relying on extrinsic evidence for that understanding of what homogeneous matrix means. And so it's like the plain and ordinary meaning to what an ordinary matrix is? Largely, yes, Your Honor. I mean, dictionary definitions, both regular definitions and technical definitions. Because as Judge Dyke pointed out, there isn't a specific definition in the specification. And each of the words are common enough English words in science and in pharmaceuticals. Homogeneous, although I think there's a typo and it says homogeneous. But homogeneous is a common enough English word. Matrix is a common enough English word in the pharmaceutical industry. But there was no evidence or testimony that the phrase homogeneous matrix, in quotes, has a particular standardized meaning to one of ordinary skill in the art. So the district court, I think quite correctly, looked at the extrinsic evidence and said uniformly dispersed. And it's strange to say that the district court didn't follow its own claim construction. But that is, in fact, we respectfully submit. What happened here? How didn't it follow its claim construction? Because the district court rejected qualifiers around uniform, substantially uniform, which was proposed in uniform. But what does that mean? Uniform means unvarying throughout. It's a narrow term. I don't understand. I mean, that sounds awfully subjective, is that one person might say this is uniform. Another person might say it's not. It's not a very helpful definition, it seems to me, as opposed to looking to the examples in the patent for the process. Well, Your Honor, so either it's very narrow and we don't infringe, or if it's really as unhelpful as the question posed, it's indefinite. And looking at the process, Your Honor, I don't think is right. First of all, I don't think it's a claim construction issue when somebody says I rely on this for support. But let's consider a claim wherein the applicant had said a matrix wherein the uniformity of the ingredients is in accordance with the result of example one or example four. Because that's really where this is going. And I don't think that that amendment would remotely have been accepted. It would not have been found by the examiner to have been supported. It would not have been found to be definite. Why wouldn't it have been supported by an example? Right. Because they're taking issue with your statement that it wouldn't have been supported. Yes, Judge. So I would not have an issue with a picture claim that is directed to a specific example. But you're close to that in your recitation of what the claim would have looked like. Well, not really, Your Honor, because a picture claim that specifies what the ingredients are in the quantitative formulation, et cetera, is very different. Here, we have a particular characteristic of the formulation, which is not identified at all in the specification. Right. So there's this phrase homogeneous matrix, which talks about something else. There's nothing in the description of the working examples that calls out or identifies as their characteristic uniformity, a certain level, et cetera. So now we have a situation that's very analogous to the Perdue v. Folding case that we talked about in our brief, where the applicant takes a characteristic, an arguable characteristic. In that case, it was a clear characteristic. But in Perdue, the examples had different characteristics. I'm sorry, Your Honor. In Perdue, the examples had different characteristics. That was the problem. Here, the only two examples which talk about the mixing are one and four, and it's the same. Well, that was part of the... Other than perhaps the difference in the ingredients, which it would seem is not a characteristic of the mixing method. Sorry, Your Honor, to have stepped over you for a moment. That was part of the problem in Perdue. Nobody usually apologizes for that. It's probably the first time anybody's apologized. That was part of the problem in Perdue, Your Honor, but it was not the only problem. See, there's not a problem with claiming less than what's in your specification. So the fact that some examples have a characteristic and some don't does not cause a problem if I have a narrowing amendment to claim some of them. The problem in Perdue really, which is what's analogous to this, is that Cmax over C24 ratio was never identified in the specification as mattering to anything. It wasn't characterized. It wasn't discussed. There was nothing in there. That's the situation here. With respect to the working examples, there's a nice discussion of what the ingredients are, but there's no discussion of the characteristic of them in terms of uniformity. Can we look at the infringement and invalidity issues independently of one another or are they inextricably tied? For example, if we conclude that there was sufficient evidence here for the district court to have concluded that there was infringement, to reach that conclusion, doesn't that tell us that the claims are not indefinite? No, Your Honor. So, okay, so it can certainly. I do, Your Honor. I do, Your Honor. I certainly do. It can be the case that a claim that is legally indefinite in an enormous part of the middle may have something clearly on one side that's infringed, that's within the claim, and clearly something on the other side that's outside of the claim. So, the fact that I can point to. But is that the situation? Doesn't that hypothetical describe a different situation than we have here? I don't think it does, Your Honor. And I'm sorry, I was answering the question in the abstract. Judges looking at the manufacturing methodologies and whatnot and saying, well, they followed this protocol and that protocol is going to result in the requisite amount of homogeneity, whatever it is. Then one ordinary skill in the art, knowing how to perform those tests, doesn't that person know that the claim is not indefinite? No, Your Honor, because again, there's not a description of the standard. I didn't explain myself very well on that. Again, the fact that I can follow something in this specification and infringe the claim does not mean necessarily that the boundaries of that claim are clear. The fact that I can pick out examples. Yeah, but necessarily is the key word there, because you created a hypothetical. When you've got edges, you can say, well, it's infringed over here, but not infringed over there and therefore. But I'm not convinced that it isn't sort of a syllogism here. If we sustain infringement, then it's not indefinite. I think, Your Honor, if you look at the particular, and I point the court to the Bouguet testimony, Dr. Bouguet's testimony about infringement and his Raman images. And again, with respect to the district court, I think it really got it wrong when it said that they were not very important, that the manufacturing process is what was important. We look at his testimony, it's clear there's no standard, there's no content, there's no objectivity. It is no better than I know it when I see it situation. So I've read it. If the patent had said, by homogeneous, we mean mixing according to example four, that wouldn't have been indefinite, right? It would be a very different case. So the case then would have been, the short answer is I don't know, Your Honor, but it would have been a very different case. Close to a picture claim. Well, we then would have looked at, for example, what are the conditions in example four? There's nothing there about how long things were screened, how they were milled, what the particle size was, how they were mixed. And Dr. Hopfenberg testified without contradiction that those things are all very important if you're trying to characterize the uniformity of a resulting product by its manufacturing process. So we would have had to have looked at that, and that would have been a very different case that we would have tried. It would have been a very different infringement case also that we would have tried, as well as a very different indefiniteness case. The homogeneity is not what was used to distinguish the prior R here, right? The amendment was made specifically to distinguish the prior R. No, but I guess I'm not being clear. In terms of the obviousness analysis, there's no contention that homogeneity in some form or other distinguishes the prior R. I'm sorry, Your Honor, I'm not following. I think that the amendment that was made. In terms of the obviousness analysis, there's no claim that there's novelty in the homogeneity requirement. No, that was specifically done to distinguish the prior R. And I think the applicant may have, in my own view, probably perhaps did pick a much more restrictive amendment there to get over the prior R, perhaps, than they had to. And we talked about the possibility that maybe they could have tried a negative limitation. Some examiners like negative limitations. Some view them with a lot of suspicion when it comes to written description. But for better or worse, they chose to go with a very narrow term, and they got an allowance based on that. And now they're stuck with it. And to say, well, I didn't have to go that narrow is an incorrect analysis. Or to say, I'm going to look at that claim, and I'm going to construe it not on its face and not on its terms, but I'm going to give the patentee the full breadth that he could have gotten if he had made less of an amendment. So I don't think that really answers the question, either from claim construction or validity. Why isn't it a fact question? So the court says it means uniformly dispersed. And then you have experts who argue over whether the accused product is uniformly dispersed. Why isn't it a fact issue? It's the second part of the infringement step. Yes, Your Honor. And in many cases, determining where claim construction ends and fact question begins can be tough. I don't think that this is one of them, because we have the benefit of the district court's analysis. This is not a black box jury verdict. But what's clear is not that people are disagreeing over the characteristics of the product, which is, I say your Raman images are wrong, and these Raman images control. That's not what's being disputed here. What's being disputed here is the meaning of uniform. Well, isn't it what's being disputed, whether those Raman images show uniformity or not? But again, yes, Your Honor. But what controls that question is, what does uniformity mean? So I think, again, we're right back to the claim construction issue here. So I do view it as an issue of claim construction. Construction of the court's construction. Correct, Your Honor. But even if it's viewed as a fact question, that does not put it beyond review. Clear error is a deferential standard. But this court reverses on facts, on jury verdicts even, which is an even more deferential standard. In the US Gypsum case says, a definite and firm conviction that it was error. It's not an unreviewable standard. And we think looking at the Raman images, we think the court actually, even if you apply the most favorable construction that you can come up with in favor of the plaintiff and trying to get to affirmance, I think there's still clear error on that. Right, so we'd have to find clear error with the reliance on the Raman images, the FDA, and also the reliance on the fact that the same mixing process was used. It sounds like a lot, Your Honor. But it really isn't. When you look at what the FDA is, there's no testimony. There's nothing in the, I'm sorry, no testimony. There's nothing in the intrinsic evidence here about FDA standards. Not anywhere. There's nothing that says that example one and example four meet FDA standards. There's absolutely nothing in there. And so what we have here, I think, is one of these gotcha situations where supernus pours through the record and finds words that match up. I find the word uniform. I find the word homogeneous. Gotcha. It's like saying, well, you're bioequivalent, so therefore you must infringe. It's just not right. And I've run way over, Your Honor. OK, we'll restore your rebuttal time for three minutes. Thank you, Your Honors. Mr. Gluck. Good morning, Your Honors, and may it please the Court. I think I'd like to pick up where the last discussion left off. And I think I could shed some light on this question that the panel and Activists' Council are struggling with. What does uniform mean? And I think the best way to do this is chronologically. So let's start with the prosecution history. During prosecution, the claims at issue were a formulation having four categories of ingredients, A, B, C, and D. The examiner identified prior art, a prior art reference, a specific reference, and rejected the claims over a formulation that had A, B, and C inside the tablet, and then a coding of element 1D. Superness comes back. That's not our invention, Your Honor. Our invention is a matrix, a homogeneous matrix comprising A, B, C, and D. This concept of homogeneous matrix is a term of art. All persons of ordinary skill in the art understand what a matrix tablet is, what a homogeneous matrix tablet is. The court made that finding, in her opinion, at Appendix 51 and 52. Well, I'm not sure that's true. I mean, that homogeneous matrix is a pretty unclear term unless you tie it to something. Now, it may be that what you did in the prosecution was to tie it to the examples in the patent, which 1 and 4 talk about the mixing. But standing alone, uniform doesn't seem to have a very precise definition in the art. It's not necessarily fatal, but it's a problem. With all due respect, Your Honor, there was ample testimony during trial from multiple experts and fact witnesses that the concept, the system of a homogeneous matrix tablet is well-known in the art. I would direct the court to that. Well, sure. I mean, there's no question about that. The question is, what does it mean? How does someone who's accused of infringing look at it and say, I can know with some certainty whether I'm infringing or not infringing? And there has to be some standard. I mean, you have these Raman images or these specks here, and people take different views as to whether image A or image B shows uniformity. It doesn't give a lot of guidance if that's the only term that you have. Whereas if you look to example 4, as you did during the prosecution, and as the district court did in finding infringement, you have a standard which is more comprehensive. I think example 4 is important to that analysis. But this is why, again, starting, this is why I started with the prosecution history. What's the analysis without example 4? That's what you keep talking about, this sort of hovering omnipresence. Everyone knows what it means. Residing judge is saying to you, well, what does it mean? He's offered example 6. Absent example 4, what's it mean? What do you look to? Let me answer that question directly. It's a binary analysis. You're either homogeneous or you're not homogeneous. If you're not homogeneous, you have one of the ingredients, A, B, C, or D, dispersed in a discrete area, like a coating. Or you can envision what we call bilayer tablets, where you have A and B on one side, C and D on another. Or you could have like an onion, a layer of A, a layer of B, a layer of C. This is what persons of skill in the art understand to be on one side of that binary equation. Meaning it's not a coating? Not a coating, not a layer, not a discrete core, not a discrete section. On the other hand, you didn't argue for that construction before the district court, did you? No, that's precisely what the district court found during Markman proceedings and in her opinion at Appendix 51 and Appendix 52. Quote, the constituents are not localized in one discrete area, but rather are found throughout the tablet surface. Appendix 52, this is again the opinion. Homogeneity in this context is measured by a lack of localization in a discrete part of the tablet. So again, the binary analysis is, are you mixed together or are you dispersed in a localized structure? Mixed together, are you inside the boundary of the pill? It's all just in there, not that it's in there in any particular way, shape, or form. Mixed together is not mixed like we would mix cake batter on a countertop. This is industrial processes that for almost a century have been well used. Now, you're saying no matter how little it's mixed within the tablet, as long as it's within the tablet instead of in a layer, it's homogeneous. A very good question, Your Honor. On one side of the tablet versus another side of the tablet, you said bi-layer, something about A, B, yellow. So bi-layer is where you have, for instance, ingredients A and B in one half of the tablet and ingredients C and D on the other half. Discreetly separated. Discrete sections of the tablet, yes. Perhaps messed up. Right. But to get back to Judge Dyke's inquiry, which I think is an important one, because I heard during activists' argument that the patent in suit says nothing about FDA uniformity testing. No, no, but stick with my last question. Right. And your question was, can you do a minimal amount of mixing? Are you saying that it's homogeneous as long as it's not in a separate layer? I am saying that if it's not. As long as there's some mixing in the center of the tablet, it's homogeneous. I would agree with that entirely, except for the concept of some mixing. The mixing, the degree of mixing is, you have to read this specification and example for through the lens of a person of ordinary skill in the art. Now, you, Judge Dyke, correctly identified examples one and four, which show manufacturing processes that, according to the applicant and the patent office, necessarily result in homogeneous matrices. So are you agreeing that the mixing process described in example four is the definition of what is required for homogeneity? What I am agreeing to is that if you mix A, B, C, and D according to the process in example four, you will necessarily get a homogeneous matrix. But there are other ways to mix. That person's of skill in the art, no. Now, example four. Yes, go ahead. That's not what you told the examiner. You said that, in describing to him what homogeneous means, you said, look at the examples. Right. And the examples are of other. Why are the examples definitional in that respect? Because the examples disclose, in one and four, processes called wet granulation. It's a standard process for mixing A, B, C, and D. Now, every time you conduct that properly. How does it hurt you if the examples are definitional? Why are you fighting this? Oh, it doesn't hurt us. I'm just trying to make sure that, for validity purposes, that the court understands that you have example four as a perfectly valid way to assess infringement. In fact, it's what the district court did, and she was successful. Fine, yeah, I understand that. But I thought you were disagreeing in saying that that's not definitional in terms of what homogeneous is, and that we want to say that anything that's not in the layer in the tablet is homogeneous. Well, to the extent example four says, mix for three minutes, then add this ingredient, and mix for another four minutes at this RPM's, my point only was, and maybe we were talking past each other, my point only was that it's not limited to those precise specifications. But the concept of example four, which is wet granulation, which is a mixing, blending, chopping, milling, sieving. High shear. High shear. These are standard mixing processes. And all I was saying, Your Honor, was that example four will necessarily mix these ingredients such that they are comprised of a homogeneous matrix. What would be the written description support for any other form of homogeneous matrix other than what Judge Dyke has been referring to? So written description support can be found in examples one and four, which we've already discussed. Example four ends with the production of tablets, and these tablets are tested in the lab. Those tablets are then taken into example five, where they're administered to canines, and then example seven, where they're administered to humans. Now, viewing this disclosure through the lens of a person of ordinary skill in the art, who would know that 21 CFR 211 absolutely requires in every instance of pharmaceutical manufacturing that a tablet be that pass FDA uniformity testing, blend and content uniformity testing before being administered to a canine or to a human, that is an implicit disclosure of the fact that these tablets were in the possession of superintendents. They actually made them according to the process as example four, and then they administer them. I understand that, but the reason why I asked the question was that you and the presiding judge were having a discussion about whether or not this homogeneous matrix is actually defined by examples one and four. And I think the presiding judge suggested he thought might be. And you were saying, well, yes, you agree with that, but you could also achieve homogeneous matrix some other way. Correct. Over here. Because the over here part, and I was saying where's the WD support for some other way of establishing homogeneous matrix other than one. There are other disclosures in the patent that explain that the claimed formulations can be made by any one of a number of other processes like slugging and other types of dry mixing and dry granulation. This is a wet granulation. Is that expressly provided in the patent, or is that something that you would maintain one of our years ago in the art would understand from reading the specification and being familiar with the technology? I would direct the court to column seven of the 898 patent at around line 43. Drug polymers and other excipients are typically coming up. Which column? 898 patent, column seven. OK. Line 43. OK. And other methods of borrowing such as slugging are used in manufacturing. Well, but that's not tied to homogeneity. And your problem is, in looking to these other things, is that during the prosecution, the one thing that you identified as support was the examples in the specification, other than the one word, homogeneous, and what used to be paragraph 34 of the application. And I don't understand why you want a broader meaning. But the purposes of this particular case, if you stand on example one and four, you prevail both ways on improvement. But you want to be able to go after somebody's bill later on that's done some way other than one and four. No, I think we're all saying the same thing. Maybe I'm confusing the issue. What you want to, what I want the panel to understand is that example four is a very specific process with very specific steps and ingredients added at certain times. And you don't think your claim should be limited to that specific process? No. And in fact, example one and example four have slight variations. So that, in and of itself, shows you that there are variations that persons of skill in the art would understand. But to the extent for this. I think what you said in the prosecution was not about what the ingredients were in examples one and four, but the mixing methodology. That's absolutely correct. But to have the claimed formulation, you would have to have A, B, C, and D mixed according to that process. Do you think that in the prosecution history, you said that the term homogenous matrix should be understood in light of the methods that are disclosed in the patent? Yes. It was unequivocal. There was an express statement that the homogeneous matrix support, what we're talking about here, is necessarily results from examples one and four. I understand you're saying that that's the written description support. But are you interpreting the claim that way? Is that how you were telling the PTO to understand the meaning of the word homogenous matrix? Yes. The PTO was hung up on the concept that maybe having something in the coding could still be part of the matrix. So that explanation was added. And the amendment and the corresponding explanation was added so that it was understood that everything was mixed together in the core. And they pointed to example four to show, look, we've actually made the type of tablet where you mix everything in the core. And that's a way to mix it. There's expert testimony that the district court credited that says persons of skill in the art understand this dichotomy between localized dispersion and uniform dispersion. And uniform dispersion is made by these techniques that mix the ingredients, whereas these localized dispersions result from coding a tablet or making a layered tablet or a bi-layered tablet or a core surrounded by some of the other ingredients. So that's really the dichotomy here. And for this case, to address Judge Clevenger's earlier question, for this case, clearly the manufacturing process in example four tracks what activists does to produce its accused product. And that was the benchmark of the judge's opinion. And then she found layers of confirmatory evidence, all fact findings, all the result of weighing competing expert testimony and fact testimony. And she found that this FDA uniformity testing, while not necessary in and of itself, confirms that the process that activists used mixes A, B, C, and D sufficiently, just like example four mixes A, B, C, and D sufficiently to result in a homogeneous matrix tablet. She also relied on chemical imaging. She dealt with chemical imaging in 15-plus pages. But she only found that it was confirmatory. Correct. But the idea that she just brushed it aside is incorrect. 15 pages of her opinion are dedicated to analyzing the competing experts' interpretation of the chemical imaging. If the definition is example four. If the definition is example four, you stop at the manufacturing process. Judge Bum was diligent in that she layered her infringement decision with three distinct layers of evidence and weighed each party's evidence in those three distinct layers to show that not only is the manufacturing process that tracks example four end the discussion, but the second, uniformity testing and chemical imaging supports that her decision. OK. Icing on the cake. Precisely, Your Honor. OK. Unless Your Honors have any other questions, I rely on my briefing for the other issues. OK, thank you, Mr. Glove. Mr. Weiss, you have two minutes. I have a question. I have a question. I have a question. It's a policy issue. It's a policy issue. I'm not going to touch on it. Thank you, Your Honor. Mr. Jobe said something right at the end in response, I think it was to your question, Judge Dyke, to the effect that if example four is definitional, you don't even get to the images. And that, to me, is an absolutely remarkable proposition in a composition of matter claim and not a method of making claim. So let's consider what would have to be the case if example four was definitional. We would have a claim that says the same degree of uniformity as example four, because it's a composition of matter claim, not a method of manufacture claim. So we would have that. And then the way you would have to prove infringement of that is not saying you use the same manufacturing process, because this isn't a process claim. It would be, here I ran example four. This is the result in terms of uniformity. And this is the result of your process, your product, because you have to compare product to product. And saying in that circumstance that we can disregard the images is a really striking proposition for- Is it too late for you to make that argument? No, it's not. I'm hearing that argument for the first time. And it's in response to what your adversaries have been arguing. It just seemed to me like they're blindsided here a little bit at the end. This theme is- I mean to be- This is all over our briefs, Your Honors. Did anyone argue that the claims were limited to example four below? No. And we have also, I mean, I think that would be also a paradigm of indefiniteness, is I have a claim to composition of matter. It's a structural limitation. Even if you say the degree that's required is the degree that's achieved in example four, it's still a structural limitation. To have a structural limitation where infringement can be proven by a manufacturing process and cannot be disproven by the actual structure of the product. That, to me, is a remarkable proposition. But I want to also point to something in the record that bears on this. Is table four, actually it's table five, are the only examples we have of embodiments that are within the scope of the claims in terms of having all four elements. Put aside uniformity. Ingredients. I'm sorry, Your Honor, right, ingredients, correct. And they all have 5% SLS. In fact, the only formulations that are ever referred to as within the scope of the claims have 5% SLS. And there was unrebutted testimony from Dr. Muzio. This is in the record at appendix 12843, lines 14 to 23, where he talks about why the activist manufacturing process doesn't lead to a homogeneous matrix. And he says, quote, Superntis is conducting its granulation using a large amount of sodium lauryl sulfate, SLS. SLS is universally used by formulators everywhere to promote uniform, homogeneous granulation. And you don't have the SLS. Correct, Your Honor. So even if we look at that. Mr. Weiss, I think we're about out of time. Way too long. Thank you for indulging me. Thank you. Thank both counsel. The case is submitted.